# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# COLUMBIA DIVISION

| | |
|---|---|
| DANNY RAY MEEKS, ) | |
| ) | |
| Plaintiff, ) | CASE NO. 1:07-0013 |
| ) | JUDGE HAYNES |
| v. ) | |
| ) | |
| TENNESSEE DEPARTMENT OF ) | |
| CORRECTIONS, et al., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM

Plaintiff, Danny Ray Meeks, a state inmate, filed this pro se action for damages and injunctive relief under 42 U.S.C. § 1983 and the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132 against state prison officials. In an earlier proceeding, the Court dismissed this action (Docket Entry No. 63). On appeal, the Sixth Circuit affirmed, in part and reserved, in part the dismissal of the individual defendants and Plaintiff's Section 1983 claims.

The Sixth Circuit summarized the procedural history and factual background of this action as follows:

> In September 2005, Meeks was directed to provide a urine sample for drug testing. Meeks could not provide a sample, claiming that paruresis prevented him from producing a urine sample. He was charged and convicted of refusal/attempt to alter a drug screen. In August 2006, Meeks was again directed to provide a urine sample for drug testing, but he could not provide a sample. He was charged and convicted of a second disciplinary offense.
>
> In March 2007, Meeks filed a complaint against the Tennessee Department of Corrections (TDOC), seven employees of TDOC (George Little, Ricky Bell, Mike Crutcher, Sam Love, Wayne Brandon, Larry Harper, Lloyd Conrad), and Debbie Love, a psychiatric nurse and the wife of Sam Love. In May 2007, the defendants moved to dismiss the complaint for failure to state a claim upon which relief may be granted, pursuant to Fed R. Civ. P. 12(b)(6). In October 2007, the district court dismissed the complaint.

(Docket Entry No. 84, Meeks v. Tennessee Department of Correction, et al., No. 08-5980, at *1 (6th Cir. 2009)).

The Sixth Circuit remanded the action on Plaintiff's claim for the injunctive relief under the ADA.

> Meeks, however, alleged that the TDOC discriminated against him by denying him lower security classification, the right to work as a legal clerk, participation in the Arts & Crafts program, visitation, and the ability to purchase packages as a result of his disciplinary convictions and continues to do so. He asked for injunctive relief. Under these circumstances, the district court may wish to consider on remand whether Meeks is entitled to an injunction under Title II of the ADA.

Id. at *3.

After a conference, the Magistrate Judge issued a Report and Recommendation that the Defendant's motion for summary judgment should be granted on Plaintiff's claims for injunctive relief on his eligibility for employment as a legal clerk and his security classification. (Docket Entry No. 220, at 7). The Magistrate Judge recommended denial of Defendant's motion for summary judgment on Plaintiff's injunctive relief "preventing TDOC from subjecting Plaintiff to disciplinary charges while enforcing its policy prohibiting prison medical staff from diagnosing Plaintiff's disorder because it may implicate inmate drug testing." Id. at 11. The Magistrate Judge also filed a Report and Recommendation that Plaintiff's motion for summary judgment be denied without prejudice to renew. (Docket Entry No. 221). Over Plaintiff's objections (Docket Entry Nos. 256, 257), the Court adopted the Magistrate Judge's recommendations. (Docket Entry No. 263). Later, the Court denied Plaintiff's motions to file supplemental complaints with unexhausted claims. (Docket Entry No. 340).

2

Before the Court is the Defendant's renewed motion for summary judgment (Docket Entry No. 331), contending, in sum: (1) that the undisputed facts show that TDOC policy does not bar a medical evaluation of an inmate's ability to comply with the drug testing procedure; (2) that the August 1, 2002 memorandum, prepared by Kevin Rea does not prohibit prison medical staff from making a diagnosis of Plaintiff's disorder and documenting that diagnosis in the inmate's medical record; (3) that the Rea Memorandum does not constitute TDOC policy regarding drug testing; (4) that Plaintiff has not been issued a disciplinary infraction regarding drug testing since August 2006, and has successfully given urine samples on three occasion since that date; and (5) that TDOC has a legitimate security interest in the control of trafficking and abuse of drugs in Tennessee prisons.

In response (Docket Entry No. 333), Plaintiff asserts: (1) that Defendant does not specify whether it references the TDOC "policy in effect at the time of the ADA violations or the TDOC policy in effect today;" (2) Defendant "attempts to dismiss the TDOC policy in effect on the two (2) separate occasions under which the Plaintiff's original complaint of Constitutional rights were violated;" and (3) that the October 1, 2007 amendment to the TDOC policy "did not retract the previous admonition prohibiting the medical staff from getting involved in inmate drug testing." Id. at 1-2. Plaintiff also asserts that Defendant's refusal to respond to Plaintiff's claims of denial of reasonable accommodation and discrimination is sufficient to infer malice and reckless indifference. Id. at 3.

### A. Findings of Fact[1]

---

[1] Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986). Upon the filing of a motion for summary judgment, the opposing

3

At all times pertinent to this lawsuit, Plaintiff was incarcerated by the TDOC in various prison facilities. (Docket Entry No. 1). TDOC facilities administer mandatory, random drug screenings of all inmates by urinalysis. Plaintiff contends he is unable to produce a urine sample because of paruresis, a social disorder which makes it very difficult for Plaintiff to urinate in the presence of others. (Docket Entry No. 134 at 12).

On September 17, 2005 and again on August 21, 2006, Plaintiff was convicted of a disciplinary charge for refusing drug screening. Following his second disciplinary conviction, Plaintiff submitted an inmate inquiry asking for an alternate form of drug testing. (Docket Entry No. 1-1 at 10). Plaintiff was informed that alternative drug testing measures would not be made available to him unless he could get an "Avoid Verbal Order" ("AVO")[2] document from the prison medical staff stating that he is unable to provide a urine sample due to a medical condition. Id. On August 29, 2006, procured a Limited Activity Notice ("LAN") that stated as follows: "Mr. Meeks has paruresis. He can give urine sample however, it may take several hours. TDOC policy #506.21 will allow dry celling for urine collection." (Docket Entry No. 1-1 at 11).

TDOC's drug testing procedure is set forth in TDOC's Policy #506.21, "Inmate Drug/Alcohol Testing Sanctions." (Docket Entry No. 252-1, TDOC Policy #506.21(VI)(B)(9-

---

party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). The Court concludes that for Plaintiff's remaining claim there are not any material factual disputes. Thus, this section constitutes finding of facts under Fed.R.Civ.P. 56(d). The Court adopts the undisputed facts.

[2] Prison medical staff issue AVOs to inmates who have a medical reason to excuse performance of a prison official request. AVO is also known as a Limited Activity Notice ("LAN"). See Docket Entry No. 1 at 13.

10)(effective date August 1, 2003 through February 15, 2007)). Under "Collection of Sample," this TDOC policy provides as follows:

> 9. The inmate must provide the urine sample within a reasonable time (two hours after entering testing area). Inmates shall be given up to eight ounces of water to assist in specimen production. Refusal to provide the urine sample is grounds for an immediate disciplinary report. Inmates who are unable to void after the above waiting time can be placed in a "dry room" for up to 24 additional hours or until a urine sample is obtained, subject to the following conditions:
>
> > a. Confinement is ordered by the Warden/designee.
> > b. The room of confinement is thoroughly searched prior to placement of the inmate.
> > c. The inmate is provided with toilet articles and a means of collecting body excretions.
> > d. The inmate remains under visual observation by staff.
> > e. The inmate may be given up to eight ounces of water every four hours, not to exceed a total of 32 ounces of water within a 24-hour period to assist in specimen production.
>
> 10. There may be extenuating medical conditions (e.g., dehydration, kidney problems, medication, etc.) that may preclude the giving of a sample. In such cases, the inmate must provide written evidence from the health care staff indicating such a condition. The Warden shall, in extreme cases, authorize the use of a drug patch test for those inmates who have a documented medical condition that would prohibit the use of urinalysis testing. Approval of the commissioner is required prior to the use of any alternate drug testing method or instrument.

Id. at 10. "Written evidence" of such a condition is documented by the inmate's health records. (Docket Entry No. 252-2, TDOC Policy #113.31, at 3).

On October 1, 2007, in an amendment to section 10 above (now section 9) psychological problems, or "social phobias" were defined to include additional conditions: "There may be extenuating medical (e.g., dehydration, kidney problems, medication, etc.) and psychological (e.g., social phobias) conditions that may preclude the giving of a sample." Id. at 55.

In a memorandum dated August 1, 2002, Kevin Rea, Turney Center Industrial Prison Health Services Administrator, advised medical staff to follow TDOC Policy #506.21 and "not

5

get involved in any manner with the collection of specimen's (sic) (urine) or the testing of specimen's (sic) for the purposes of security drug testing." (Docket Entry No. 1-1 at 18).

TDOC Policy #113.31, "Sick Call/Assessment of Health Complaints" sets forth "sick call times and procedures to ensure that all inmates have the opportunity to report a medical, dental, or mental health complaint and to receive diagnosis and/or treatment for their condition." (Docket Entry No. 252-2, TDOC Policy # 113.31, at 2). This policy describes the manner in which health assessments are documented. Under "Treatment," this policy states that health care providers are to document "all assessments, referrals, and treatment provided" using SOAP format on form CR-1884 ("Problem Oriented—Progress Records," or medical notes). Id. at 3,4.[3] Health care providers are to "[c]omplete Limited Activity Notice, CR-2893, for patients requiring temporary absence (i.e., thirty days or less) work or other physical restrictions, and complete TOMIS conversation LHST. If the patient has a condition that exceeds thirty days in duration, the health classification may be re-evaluated." Id. at 3. Thus, the LAN can excuse an

---

[3] The "SOAP" note in the medical records is explained in TDOC Policy #113.50, "Health Records," (Docket Entry No. 252-2 at 25) as follows:

A. Health Record: A written detailed account containing, but not limited to, any histories, summaries, diagnoses, prognoses, records of treatment and medication, reports of x-rays, laboratory diagnostic studies, and other graphic data pertaining to health care services rendered in a hospital, infirmary, emergency room, out-patient/inpatient facility, dental, psychiatric, or psychological treatment setting.
    B. S.O.A.P. Format: Method of documenting clinical assessments in the health record.
        S. = Subjective-patient reported complaint(s) and history; symptoms, onset, remedies tried, etc.
        O. = Objective-examinations and diagnostic tests, e.g., vital signs and lab results.
        A. = Assessment-diagnostic impression, rule -outs, treatment options, etc.
        P. = Plan-specifics of treatment plan; intervention medication, follow-up, etc.

inmate from ordinary work or program requirements, but does not furnish a diagnosis, or any other health assessment, and cannot satisfy the requirement of the drug testing policy, #506.21.

The Rea Memorandum advises that LANs lack force and effect and physicians are not to use a LAN to excuse an inmate from a urine sample for a drug test. Donna White, TDOC's assistant commissioner for clinical services, confirms that TDOC's medical complaints procedure and Rea's memorandum are consistent.

> I have reviewed the memorandum of Kevin Rea, dated August 1, 2002. The advice therein regarding physician involvement in inmate drug testing is in keeping with healthcare policy, both as it applied then and as it applies now, regarding the manner in which inmates' medical complaints and conditions are assessed, and the manner in which such assessments are recorded. At no time relevant hereto has any healthcare policy of the Department of Correction provided that a "Limited Activity Notice" may be employed as a record of a medical or other clinical assessment.

(Docket Entry No. 251, White Affidavit at ¶ 4). White also explains that:

> At all times relevant hereto, in my capacity as Assistant Commissioner for Clinical Services, and previously as Director of Health Services for the Department, I have had had immediate authority for defining the role of the Institutional Health Administrators at the several facilities of the Department. At all times relevant hereto, in my official capacity, I have been acquainted with the work of Mr. Kevin Rea, as the Health Administrator for the Turney Center Prison. Tennessee Department of Correction Policy regarding Drug and Alcohol testing of inmates is not within the purview of my office, and it is not within the purview of the several Institutional Health Administrators. It is not now nor has it at any time been within the authority of Mr. Kevin Rea or of any other Institutional Health Administrator to declare a matter of policy for the Department of Correction whether in the matter of drug testing, in matters of health administration, or in any other matter reserved to the Commissioner of the Department of Correction under the laws of Tennessee.

Id. at ¶¶ 2-3.

William Gupton, Director of TDOC's Substance Abuse Programs, manages and administers substance abuse treatment programs on drug and alcohol use in the inmate population. (Docket Entry No. 251, Gupton Affidavit at ¶ 1). Gupton states that:

> Tennessee Department of Correction Policy regarding Drug and Alcohol testing of inmates is within the exclusive purview of my office, by delegation of and subject to the approval of the Commissioner of the Department of Correction. It is not now nor has it at any time been within the authority of Mr. Kevin Rea or of any other Institutional Health Administrator to declare a matter of policy for the Department of Correction in the matter of drug testing, or in any other matter reserved to the Commission of the Department of Correction under the laws of Tennessee.

Id. at ¶ 2.

Plaintiff has not been subjected to any disciplinary charges regarding TDOC drug testing procedures since August 2006. Id. at ¶ 3. Also since this time, Plaintiff has produced urine samples three times. Id. In no instance did Plaintiff refuse to provide a sample. Id.

### B. Conclusions of Law

"The very reason of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Advisory Committee Notes on Rule 56, Federal Civil Judicial Procedure and Rules (West Ed. 1989). Moreover, "district courts are widely acknowledged to possess the power to enter summary judgment sua sponte, so long as the opposing party was on notice that [he] had to come forward with all of [his] evidence." Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Accord, Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

In Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." By its very terms, this standard provides that the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact.
>
> <u>As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.</u> Factual disputes that are irrelevant or unnecessary will not be counted.

477 U.S. at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no `genuine issue for trial.'" <u>Matsushita Electrical Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery. <u>Celotex</u>, 477 U.S. at 326 (1986). Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. <u>Emmons v. McLaughlin</u>, 874 F.2d 351, 355-57 (6th Cir. 1989). But see <u>Routman v. Automatic Data Processing, Inc.</u>, 873 F.2d 970, 971 (6th Cir. 1989).

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties, as described by the Court in <u>Celotex</u>:

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and

> identifying those portions of "the pleadings, depositions, answers to
> interrogatories, and admissions on file, together with the affidavits, if any," which
> it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e
> find no express or implied requirement in Rule 56 that the moving party support
> its motion with affidavits or other similar materials negating the opponent's claim.

Celotex, 477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." Martin v. Kelley, 803 F.2d 236, 239, n. 4 (6th Cir. 1986). The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. Sims v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991)(quoting Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of 'demonstrat[ing] the absence of a genuine issue of material fact,' the nonmoving party then 'must set forth specific facts showing that there is a genuine issue for trial.'" Emmons, 874 F.2d at 353 (quoting Celotex and Rule 56(e)).

Once the moving party meets its initial burden, the United States Court of Appeals for the Sixth Circuit warned that "the respondent must adduce more than a scintilla of evidence to overcome the motion [and]. . . must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989)(quoting Liberty Lobby). Moreover, the Court of Appeals explained that:

> The respondent must "do more than simply show that there is some metaphysical
> doubt as to the material facts." Further, "[w]here the record taken as a whole
> could not lead a rational trier of fact to find" for the respondent, the motion should
> be granted. The trial court has at least some discretion to determine whether the
> respondent's claim is "implausible."

Street, 886 F.2d at 1480 (citations omitted). See also Hutt v. Gibson Fiber Glass Products, 914 F.2d 790, 792 (6th Cir. 1990) ("A court deciding a motion for summary judgment must

10

determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'") (quoting Liberty Lobby).

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

> More important for present purposes, <u>summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party</u>.
>
> . . . .
>
> Progressing to the specific issue in this case, we are convinced that <u>the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits</u>. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, <u>the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented</u>. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. <u>The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict -- "whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed."</u>

Liberty Lobby, 477 U.S. at 248, 252 (citation omitted and emphasis added).

It is likewise true that:

> In ruling on [a] motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It has been stated that: 'The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute. . . .'

11

Bohn Aluminum & Brass Corp. v. Storm King Corp., 303 F.2d 425, 427 (6th Cir. 1962) (citation omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion." Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986) app 840 F.2d 16 (6th Cir. 1988) (unpublished opinion) (citation omitted).

The Court of Appeals further explained the District Court's role in evaluating the proof on a summary judgment motion:

> A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establish a genuine issue of material fact for trial. This marshalling of evidence, however, does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of." Webster's Third New InterNational Dictionary (1986).
>
> Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989). In this district, the parties must provide specific references to the proof upon which they rely. See Local Rule 56.01(c) requiring each party to provide a statement of undisputed facts to which the opposing party must respond.

In <u>Street</u>, the Court of Appeals discussed the trilogy of leading Supreme Court decisions, and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions:

1. Complex cases are not necessarily inappropriate for summary judgment.

2. Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3. The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

4. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5. A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

6. As on federal directed verdict motions, the "scintilla rule" applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7. The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8. The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

9. The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10. The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is

some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

Street, 886 F.2d at 1479-80 (citations omitted).

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) has the moving party "clearly and convincingly" established the absence of material facts?; (2) if so, does the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense?; (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

Prison administrators are accorded wide-ranging discretion in adopting and executing policies and procedures which, in their expert judgment, are necessary to preserve internal order and discipline, and to maintain security. O'Lone v. Estate of Shabazz, 482 U.S. 342 (1987). "[B]ecause 'the problems of prisons in America are complex and intractable,' and because courts are particularly 'ill equipped' to deal with these problems, [courts] generally have deferred to the judgments of prison officials in upholding these regulations against constitutional challenge." Hayes v. Tennessee, 424 Fed. Appx. 546, 550 (6th Cir. 2011) (citations omitted).

"[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89 (1987). In determining the reasonableness of a regulation, the Court must consider the following: (1) whether a valid, rational connection between the prison regulation and the

legitimate governmental interest exists; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and (4) whether ready alternatives exist. Id. at 89-91.

TDOC's current surveillance data reflects that drugs are detected in approximately nine percent of inmate urine specimens tested. (Docket Entry No. 251, Gupton Affidavit, at ¶ 4). The trafficking in and possession of illicit substances within the inmate population is a serious threat to institutional security and health. Id. Therefore, the Court concludes that TDOC Policy #506.21 is reasonably related to legitimate security concerns.

As to the remaining factors, the Court concludes that TDOC Policy #506.21 precludes neither the use of alternative drug testing measures nor a medical evaluation of an inmate's ability to comply with the drug testing procedure. Under the policy, an inmate who cannot produce a urine sample must provide written evidence from the health care staff of the extenuating medical and psychological condition impeding the giving of a sample. (Docket Entry No. 252-1, TDOC Policy #506.21(VI)(B)(9), at 55). The Warden may authorize "the use of an alternative drug testing method for those Inmates who have a documented medical condition that would prohibit the use of urinalysis testing." Id. As TDOC Policy #506.21 allows a reasonable accommodation of Plaintiff's condition, the Court concludes there are not any facts that Plaintiff will be subjected to future disciplinary convictions for refusing a drug screening due to his paruresis.

Given Gupton's affidavit, the Court concludes that because Rea lacks the policymaking authority for TDOC, the Rea Memorandum does not constitute TDOC policy regarding drug

testing. See Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986)) (Policy exists when a "decisionmaker possessing final authority to establish municipal policy with respect to the action 'issues an official proclamation, policy, or edict.'"). In any event, the Rea Memorandum is consistent with TDOC Policy #506.21.

For the reasons stated herein, the Court concludes that there is no genuine issue as to any material facts, and Defendant is entitled to judgment on Plaintiff's injunctive relief claims given these undisputed facts. Thus, this action should be dismissed with prejudice.

An appropriate Order is filed herewith.

**ENTERED** this the 12th day of March, 2012.

WILLIAM J. HAYNES, JR.
United States District Judge